NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
:
CUPID FOUNDATIONS, INC., :
:
         Plaintiff, :
    v. : CIVIL ACTION NO. 07-5506 (JLL)
:
JUPI CORPORATION, : **OPINION**
:
         Defendant. :
_____ :

**LINARES**, District Judge.

    This matter is before the Court by way of an application for claims construction by Plaintiff Cupid Foundations, Inc. ("Plaintiff" or "Cupid") and Defendant Jupi Corporation ("Defendant" or "Jupi") (Docket Entry Nos. 53, 54, 55, and 56.)  The parties seek the Court's interpretation of certain language contained in the claims of United States Patent No. 7,228,809 (the "'809 Patent").  The '809 Patent, entitled "Undergarments Having Finished Edges and Methods Therefor," is directed to a particular method of finishing the edge of a piece of fabric.[1]

    The Court held a <u>Markman</u> hearing on May 7, 2009,[2] and has considered the parties' written and oral arguments.  The Court sets forth herein its construction of the disputed claim terms.

---

[1] The 809 Patent is contained as Exhibit A within the Kochanski Declaration submitted in support of Cupid's opening claim construction brief.  The Court will cite to this Exhibit as the "809 Patent" and will include the column number and applicable line numbers for each citation.

[2] "Tr." refers to the transcript of the May 7, 2009 <u>Markman</u> hearing.

1

**I.      Legal Standard**

A court's analysis of a patent infringement claim is two-fold. Tate Access Floors, Inc. v. Interface Architectural Resources, Inc., 279 F.3d 1357, 1365 (Fed. Cir. 2002). The court must first define the meaning and scope of the patent claims as a matter of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 978 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). The court then engages in a comparison of the claims as construed to the alleged infringing product (or method). Tate, 279 F.3d at 1365. At this stage, the Court must only engage in the first step.

Claim construction is a matter of law to be determined solely by the court. Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005), cert. denied, 546 U.S. 1170 (2006). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Id. at 1312 (quotations omitted). In construing the terms of a patent, a court should look first to the language of the claim itself. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). The terms in the claim "are generally given their ordinary and customary meaning." Id. at 1582.[3] "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips, 415 F.3d at 1313. A court "must look at the ordinary meaning in the

---

[3] The Court recognizes that two situations exist in which it must enter a definition different from the ordinary and customary meaning: (1) where the "patentee has chosen to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term," Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 990 (Fed. Cir. 1999) (citing In re Paulsen, 30 F.3d 1475, 1480 (Fed. Cir. 1994)), and (2) where "the term or terms chosen by the patentee so deprive the claim of clarity that there is no means by which the scope of the claim may be ascertained from the language used," id. (citing Eastman Kodak Co. v. Goodyear Tire & Rubber Co., 114 F.3d 1547, 1554 (Fed. Cir. 1997)).

context of the written description and the prosecution history." Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005). The court should turn to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1116 (Fed. Cir. 2004).

To this end, the court should first examine the intrinsic record – the patent itself, including the claims, the specification and the prosecution history. Vitronics, 90 F.3d at 1582 (citing Markman, 52 F.3d at 979). The specification "acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." Id. Indeed, the Federal Circuit explains that the specification is "'usually . . . dispositive . . . [and] the single best guide the meaning of a disputed term.'" Phillips, 415 F.3d at 1315 (quoting Vitronics, 90 F.3d at 1582). It is "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." Id. at 1317. The specification is also an important guide in claims construction as it may contain "an intentional disclaimer, or disavowal, of claim scope by the inventor." Id. at 1316.

Additionally, the court should consult the patent's prosecution history as it "provides evidence of how the PTO and the inventor understood the patent." Id. The prosecution history is the complete record of the proceedings before the PTO and includes the prior art cited by the patentee during examination of the patent. Id. at 1317. Moreover, the prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id. Indeed, the Federal Circuit has

3

repeatedly emphasized the need to consult the prosecution history to "exclude any interpretation that was disclaimed during prosecution." Chimi v. PPG Indus., 402 F.3d 1371, 1384 (Fed. Cir. 2005).

A district court may also examine extrinsic evidence – "all evidence external to the patent and prosecution history." Markman, 52 F.3d at 980; Phillips, 415 F.3d at 1317-18 (stating that the Federal Circuit "ha[s] authorized district courts to rely on extrinsic evidence"). Such evidence consists of testimony by the inventor or by experts, dictionaries, and treatises. Markman, 52 F.3d at 980. In particular, a court may find reference to technical dictionaries useful "in determining the meaning of particular terminology." See Phillips, 415 F.3d at 1318. However, extrinsic evidence is generally thought less reliable than the patent and prosecution history, id. at 1318-19; in essence, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language," C.R. Bard, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004) (quotation omitted). With this framework in mind, the Court now turns to the disputed claim language.

## II.     Discussion

### A.     Cut Edge

Claim one of the 809 Patent is representative of the terms Edge, Cut Edge, and Over The Edge." Claim one reads:

> A method of making a fabric having a finished edge comprising: cutting a fabric to provide a cut edge having a plurality of fibers, at least some of said fibers having free ends terminating at an edge of said fabric; after cutting the fabric, disposing a bead of a curable polymer over at least a portion of the cut edge of said fabric so that said curable polymer engages the free ends of said fibers at the edge of said fabric; after the disposing step, curing said polymer for finishing the edge of said fabric, wherein the finished edge is an unopposed edge that is stretchable for adjusting to movement

    of said fabric.

(809 Patent 13:60-14:6.)

    Turning first to the term "Cut Edge," (a term upon which both parties generally agree), Cupid proposes the following definition: "[t]he outer extremity or outer edge of the edge of the fabric or cut pattern piece or garment, created by the act of cutting." Jupi, on the other hand, defines Cut Edge as "the entire two-dimensional surface that is perpendicular to the two faces of a fabric and that is created when the fabric is cut." The parties conceded at the Markman Hearing that they agree on the location of the Cut Edge but simply disagree over the exact definition. (Tr. 58:20-24.) In this case, both definitions also note that it is the act of cutting that creates a Cut Edge.

    This Court agrees that Jupi's definition is the correct way to define Cut Edge." For starters, Cupid's definition is vague and confusing – by defining Cut Edge as the "outer edge of the edge," the term is as clear as if the Court had failed to define it in the first place. Taking Cupid's definition as written, a jury would be tasked with first determining what an edge is and then determining what could constitute the "outer edge" of the "edge." Additionally, however, counsel for Jupi argued during the Markman Hearing that only the two-dimensional surface, depicted by green in Defendant's Exhibit 1, is created by the actual act of cutting. (Markman Hearing, Def. Exh. 1.) If the Court adopted Cupid's definition, then the same portion of the fabric that existed prior to the cut would be incorporated into the definition of the region created by the act of cutting. Thus, the Court acknowledges the general agreement between the parties as to the location of Cut Edge but finds that Jupi's proposed definition is a more accurate description of that region.

### B.    Edge

Having defined Cut Edge, the Court moves on to define Edge. This is where the brunt of the disagreement lies. Jupi argues, quite simply, that Edge and Cut Edge are synonymous and therefore Edge should be defined as Cut Edge. Cupid strenuously opposes this definition and proposes its own: "[t]he surface area or region located at the exterior of the fabric or cut pattern piece as compared to the interior." Several factors counsel in favor of accepting Jupi's definition.

First, and most importantly, the prosecution history of the '809 patent contains an Inventors' Amendment, filed on June 21, 2006 in response to an office action dated April 7, 2006. (Jupi Opening Br., Exh. B.) The Patent Examiner had rejected several of the 809 Patent claims as unpatentable over U.S. Patent No. 4,596,616 to Noda, and in the June 21, 2006 Inventors' Amendment, Cupid sought to distinguish its patent from Noda. Thus, Cupid argued:

> In response, Applicants respectfully assert that the adhesive 3 is not applied over loose fibers at the edge of the fabric. Moreover, in column 5, lines 35-43, Noda specifically teaches that the adhesive 3 is positioned at a distant inside a sewing line 9 which is spaced from an edge of fabric. For these reasons, Applicants respectfully assert that Noda teaches that the adhesive is spaced away from the edges of fabric and is not placed over loose fibers at the edge of the fabric as required by the claims of the present application.

(Id. at 16.) Thus, in order to distinguish its patent from Noda, Cupid disclaimed polymer disposed "away from" the edge of the fabric, instead insisting that the '809 patent requires polymer placement "over loose fibers at the edge of the fabric." (Id.) Cupid's argument to the contrary, with respect to the Noda reference, is unpersuasive. Cupid essentially argues that Noda does not apply because Noda addressed basting and dealt with the placement of adhesive relative to the edge of fabric. (Cupid Resp. Br. 11.) Regardless of whether or not the Noda Patent

6

addressed basting as opposed to finishing an edge, the language of the Inventors' Amendment is clear and unequivocal – it specifically disclaims the region "away from the edges of fabric" and requires placement of polymer over "loose fibers at the edge of the fabric."

Next, the intrinsic evidence in the 809 Patent supports Jupi's interpretation. Claim one, as indicated earlier, acknowledges that a finished edge begins with a cut fabric with "a cut edge having a plurality of fibers, at least some of said fibers having free ends terminating at an edge of said fabric." (809 Patent 13:63-65.) The claim goes on to mandate the disposal of polymer over "at least a portion of the cut edge of said fabric so that said curable polymer engages the free ends of said fibers at the edge of said fabric." (Id. 13:66-14:2.) The free ends of the fibers must terminate at the Cut Edge. That is the two-dimensional perpendicular surface created by the act of cutting – therefore, it is the termination point for free ends of fibers. However, Claim one defines the fibers as having free ends terminating "at an edge." This simply cannot be, unless "an edge" is equivalent to Cut Edge. Under Cupid's proposed definition, the free ends of fibers would terminate at the "surface area or region located at the exterior of the fabric or cut pattern piece as compared to the interior." Thus, the termination point of the free end of a fiber could very well include the entirety of the free fiber end. This simply cannot be. Free ends of fibers terminate at the Cut Edge; Claim one, by describing the termination of fibers at "an edge" lends intrinsic support to Jupi's argument that Cut Edge and Edge are one and the same.

Cupid strenuously argues that Fig. 12B, showing an embodiment of the patent, directly contradicts the definition offered by Jupi. Fig. 12B is described as follows: "The pattern piece 220 has top surface 230 and outer edge 222. A first silicone bead 262 is deposited over the edge 222 of the pattern piece so as to finish the free ends of the fibers that terminate at the edge of the

7

pattern piece." (809 Patent 10:56-58.) Thus, Cupid argues that under Fig 12B's depiction of the process, polymer is never actually placed on the two-dimensional perpendicular surface that makes up the entirety of Jupi's Edge/Cut Edge. Cupid's argument suffers from two flaws. First, the diagram itself lends support to Jupi's interpretation of Edge by using the number 222 to refer both to the "outer edge" as well as the "edge." Given that Cupid's proposed interpretation of Cut Edge included the limiting term "outer edge," the fact that the number 222 is used in the diagram to refer to Edge and Outer Edge interchangeably is an indicator that Edge and Cut Edge are synonymous. After all, "...the same reference character must never be used to designate different parts." 37 C.F.R. §1.84(p)(4). In that respect, the intrinsic evidence provided by Fig 12B supports Jupi's definition as it uses effectively uses Cut Edge and Edge interchangeably.

Moreover, Cupid itself acknowledges that Fig. 12B is akin to placing polymer such that it resembles "pouring hot fudge over ice cream" because in that case "the liquid hot fudge flows on the surface of the ice cream." (Cupid Opening Br. 21.) Thus, the fact that 12B depicts polymer on the top surface of the fiber rather than on the Cut Edge does not mean that polymer never reaches the Cut Edge. In fact, it does. It must. The polymer flows over the surface of the fiber and engages the Cut Edge just as the hot fudge flows over and down the surface of the ice cream. The diagram in 12B, if interpreted literally as Cupid urges, would never actually touch the Cut Edge of the fabric. And if the polymer never reaches the Cut Edge, it certainly cannot bind the edge or prevent it from fraying.

Next, aside from the pure intrinsic evidence outline above, Cupid's definition – if accepted – would engender confusion as to the dividing line between the exterior and interior regions of the fabric. Cupid's response to this problem of vagueness is twofold. First, Cupid

8

argues that a jury can determine what constitutes exterior and what constitutes interior. (Tr. 24.) Second, Cupid argues that the issue is whether or not the placement of the adhesive finishes the edge or not. (Id. 26.) Thus, under Cupid's storyline, the issue is not whether placement of the adhesive is a certain distance away from the edge or not but rather whether by placing the adhesive in a certain location the purpose of the patent (to prevent fraying or tearing at the cut edge) has been fulfilled. (Id. 26-27.)

The Court disagrees as to both counts. With respect to the former argument, a patent must necessarily define the claims such that a potential competitor knows whether or not he is infringing. Morton Int'l, Inc. v. Cardinal Chemical Co., 5 F.3d 1464, 1470 (Fed Cir. 1993). The adoption of Cupid's definition is tantamount to this Court punting on the issue completely, as it would theoretically leave nearly the entire surface of the fabric open for polymer application. Next, whether or not placement of the polymer has fulfilled the purpose of the patent is certainly a relevant question, but it does not in and of itself define Edge/Cut Edge. In this case, one purpose of the patent is to prevent fraying and tearing at the Edge. The claims of the patent clearly indicate that polymer, in order to fulfill the purpose of the patent, must be applied to the Cut Edge. Without polymer application at the Cut Edge, the free ends of the fibers are not finished and cannot be resistant to fraying or tearing. Cupid appears to argue that if polymer is place somewhere in an undefined "exterior" region, it is acceptable so long as the fabric does not fray or tear. That is not the case. The prevention of fraying and tearing is certainly an objective of the patent but the method by which to accomplish that objective requires polymer application to the Edge/Cut Edge.

Given the strength of evidence provided by the Inventors' Amendment as well as the

Claim language itself, this Court finds that Edge is defined as Cut Edge.

### C. "Over the Edge"

Moving on to another edge-related term, the parties seek the Court's guidance regarding the term Over the Edge. Jupi defines this term as "on or along the edge of a fabric, such that it engages the fiber free ends." Cupid defines it as: "on the top surface of the cut edge of said fabric" or "on the top surface of the edge of the fabric." Having discussed Edge and Cut Edge at length, the other terms of the 809 patent fall from the Court's already-decided definitions. In this case, the Court has already noted that the polymer must engage the fiber free ends – without reaching the Cut Edge, the polymer does not actually finish the edge. Thus, the Court must adopt Jupi's definition, which specifies that the polymer engages the fiber free ends.

### D. "Finished Edge" and "Finishing the Edge"

The main disagreement with the definition of these terms lies in whether or not the definition should include all of the benefits and advantages that one receives by finishing the edge using the manner claimed in the '809 patent. According to Cupid, a Finished Edge is: "An edge of a fabric, garment or cut pattern piece that is resistant to fraying and tearing as contrasted with an unfinished edge that is susceptible to fraying and tearing." Finishing the Edge is, very simply, "the act of creating a finished edge." Jupi seeks a much more detailed definition, arguing that both Finishing the Edge and a Finished Edge require the same definition, as follows: "treating a fabric so that it does not fray or tear; so that the edge grips and does not ride up over a wearer's body; so that it provides a smoother edge than garments that use folded-over edges, narrow elastic, trim and/or lace at the edge; and so that the fabric at the edge does not roll."

Cupid's main argument is that the fundamental basis for the claimed invention is to

respond to the tearing and fraying problem that occurs when outer edges of a garment are left unfinished. Thus, the specification of the '809 patent reads as follows:

> Most garments are made by cutting fabric into pattern pieces and then sewing the cut pattern pieces together to make the garment. Typically, each cut pattern piece has one or more edges that are sewn to the edges of one or more adjacent cut pattern pieces, which forms a seam between the cut pattern pieces. The outer edges of the garment, however, are not sewn to the edges of other cut pattern pieces. As a result, the outer edges are exposed to forces that may fray or tear the fabric. In response to the tearing and fraying problem, the clothing industry has developed methods for finishing the edges of garments, including using narrow elastic, lace, trim and/or a folded over edge. The clothing industry also uses fabric having a knitted-in edge. Although this particular type of fabric provides garments having smoother edges, its use results in relatively low material yields.

(809 Patent, 1:19-24.) Thus, the specification clearly references this patent within the larger world of methods used to finish the edges of garments in order to prevent fraying and tearing. The specification, however, also references the need:

> for garments having finished edges that are not bulky. There is also a need for garments having finished edges that can grip and that do not ride-up over a wearer's body to cause binding. There is also a need for garments having finished edges that are smooth and that do not show through outer garments. Furthermore, there is a need for methods of making garments that improve material yield and reduce waste.

(809 Patent 2:38-46.) Thus, Jupi argues that each of these additional characteristics must also be included within the definition of Finished Edge. This Court agrees.

Generally, as Cupid correctly notes, "[a]dvantages described in the body of the specification, if not included in the claims, are not *per se* limitations to the claimed invention.." (Cupid Br. 16) (citing Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294 (Fed. Cir.

11

2003) (citation omitted).  In Brookhill, the Court addressed a written description of the invention that included many different objectives.  Thus, the invention in that case did not limit itself to the specific objective argued by the parties – rather, it cast a wider net.  Here, Cupid seeks to include the Finished Edge's resistance to fraying or tearing within its definition but not the additional enumerated benefits that it brings to the table.  Unlike the Brookhill matter, this patent clearly claims to address all of the above issues – fraying, tearing, riding up, smoothness, and grip – in all of its uses.  In other words, there is no embodiment of the '809 patent in which a Finished Edge would be resistant to fraying or tearing but not to riding up.  Thus, the Court finds that if Cupid wants to include the fraying/tearing characteristic, it must include the rest.  Accordingly, the Court adopts Jupi's definitions as to both Finished Edge and Finishing the Edge.

**E.     Free Ends**

Next, the parties seek to construe "free ends terminating at an edge."  Cupid argues for a wide definition – "the portion of the length of fibers making up the fabric/cut pattern piece located at the edge of the fabric/cut pattern piece."  Jupi argues that free ends are "fibers whose ends are loose in that they are not connected to other fibers."  Cupid's definition of Edge, as noted above, could or would include fibers who are not entirely loose, i.e., fibers that are located in the exterior region of the fabric.  By defining Edge so broadly, Cupid's Free Ends definition similarly lacks logic.  The free ends have to be "free"; they cannot be part of the woven fabric itself.  However, having already recognized that Edge is the same as Cut Edge, the Court notes that the free ends of fibers are longer than the Edge.  They terminate at the Edge, but have a specific length of their own.  In that respect, Jupi's definition is the better one.  It indicates that the Free Ends of the fibers are those ends that are loose and that are separate from other fibers.

These Free Ends terminate at the Edge or Cut Edge of the fabric, whereupon curable polymer is applied.

### F. Proximate

The parties also voice strong disagreement over the term Proximate. Jupi defines Proximate as "touching" whereas Cupid defines it as "at or near or close to, but not necessarily touching." Clearly the parties, on this definition, are diametrically opposed. Cupid relies on the dictionary definition of Proximate, a definition that Jupi agrees would support Cupid's interpretation. Jupi, however, cites to the language of Claim 32 as evidence that the word Proximate, as defined and used by Cupid in the patent, is different from the dictionary definition. Claim 32 reads as follows:

> A garment comprising: a cut pattern piece having a cut edge, said cut pattern piece including a fabric having a plurality of fibers with free ends that terminate at the cut edge of said pattern piece; and a bead of cured polymer material provided *proximate* to the cut edge of said cut pattern piece, wherein said bead of cured polymer material contacts at least some of the free ends of said fibers at the cut edge of said fabric for finishing the edge, wherein the finished edge is an unopposed edge that is stretchable for adjusting to movement of said fabric.

(809 Patent 16:6-17)(emphasis added). The word Proximate is also featured in two additional claims – Claim 39 ("a bead of a polymer material provided on said stretchable fabric in proximate contact with the free ends of said fibers terminating at the cut edge of said pattern piece, wherein said polymer provides a finished edge") and Claim 51 ("disposing a curable polymer over the edge of said fabric so that said curable polymer engages said fibers proximate to said unfinished edge of said fabric"). (809 Patent 17:5-9; 18:36-38.)

As indicated earlier, the 809 Patent requires polymer to be applied to the Cut Edge or Edge (the terms are now defined identically). Without application to the Cut Edge/Edge, the

13

polymer cannot bind the fibers at the Edge and therefore cannot prevent fraying or tearing. In this case, Claim 32 allows for the application of polymer "near" the Cut Edge but specifies that the polymer must contact some of the fibers at the Cut Edge. Similarly, Claim 39 describes polymer in "proximate contact" with the fibers at the Cut Edge but then specifies that the polymer must provide a finished edge. And Claim 51 discusses the disposition of polymer over the Edge/Cut Edge such that it engages the fibers proximate to the unfinished edge. In all three cases, the regular dictionary definition of Proximate properly fits within the definition used, if only because each Claim specifies or includes the fact that even though polymer is applied "proximate" to the Cut Edge, that polymer eventually contacts the actual Cut Edge. Thus, given that the Claims in question discuss proximate polymer application but mandate that polymer also contact the Cut Edge, this Court adopts Cupid's definition of Proximate.

### G.   Engages

With respect to Engages, the fight is as follows. Jupi proposes "physically bind." Cupid proposes: "Polymer is placed *on or in contact with* the fabric at the edge of the fabric/cut pattern piece." The 809 Patent clearly supports Cupid's interpretation of Engages.

The intrinsic evidence, in various claims, explicitly refers to the polymer engaging and/or contacting. See, e.g., 809 Patent, 9:29-34 ("As shown in Fig. 7C, the silicone 162 engages and/or contacts the free ends 128 of the fibers 126."); 10:15-16 ("The first bead of silicone material 262 preferably contacts . . . the free ends . . ."); 4:65-5:2 ("The method desirably includes after the cutting step, disposing a curable polymer over the edges of the cut pattern piece so that the curable polymer engages the free ends fo the fibers at the edges of the pattern pieces.") Jupi offers no support for its interpretation, other than a claim that what the polymer is actually doing

is physically binding the fibers. However, a close look at the 809 Patent indicates that "[a]fter the curable polymer is disposed, the polymer is desirably cured for binding the free ends . . . ." (809 Patent 5:2-5). Thus, the disposing step simply involves applying the polymer such that it contacts the free ends of fibers. The curing step is the step during which the polymer physically binds the fibers. In short, the 809 Patent is clear – Engages means "on or in contact with."

**H.     Contacts**

The dispute over Contacts is identical to the argument over Engages. The Court therefore agrees with Cupid's definition, that Contacts means "a coming together or touching, as of objects or surfaces." Once again, the polymer might contact or touch the free ends of the fabric, but it does not physically bind those ends until it is cured.

**I.     Cut Pattern Piece**

With respect to Cut Pattern Piece, the differences in definition are minor. Jupi proposes: "a piece of fabric of no particular shape or size that is cut" whereas Cupid proposes "a piece of fabric that is cut into a defined shape and size." As Cupid notes, a patter has a defined shape and size. Thus, the Cut Pattern Piece must have a defined shape and size that corresponds with the pattern that is being cut. The Court therefore adopts Cupid's definition of Cut Pattern Piece.

**J.     Cutting**

The parties define Cutting slightly differently as well – Jupi: "separating fabric by the act of cutting into pattern pieces"; Cupid: "separating fabric by the act of cutting." The relevant portion of the 809 Patent cited by the parties reads as follows: "Most garments are made by cutting fabric into pattern pieces and then sewing the cut pattern pieces together to make the garment." (809 Patent 1:9-11.) Thus, cutting is simply defined as separating the fabric by

cutting. The result of cutting, or the purpose of cutting, as indicated by the 809 Patent, is to separate the fabric into pattern pieces. However, Cutting itself is simply the separation of fabric – accordingly, Cupid's definition governs.

### K. Bead

Next, the parties dispute the term Bead. Jupi argues that it is a "band," whereas Cupid suggests that it is a "continuous or non-continuous strip of curable polymer/cured polymer/polymer material that extends along a path." Jupi acknowledges that it is amenable to the use of the word "strip" instead of "band." (Jupi Reply Br. 14.) Therefore, the crux of the dispute comes down to whether or not Bead can include a non-continuous strip. The 809 Patent explicitly allows for polymer application in a continuous or non-continuous fashion. It states:

> The silicone may be applied along a straight edge of a pattern piece or may be applied in a pattern that follows the contour of the edge of the pattern piece, e.g., the silicone may follow the contour of the curved edge. The silicone may also be applied to an interior region of the pattern piece that is remote from an edge. The silicone may be applied along paths are curved, S-shaped, and/or non-continuous (e.g., silicone provided in a dotted pattern).

(809 Patent 11:24-31.) Thus, the 809 Patent allows for application in a continuous or non-continuous path – for example, the polymer can be applied in a dotted fashion whereby it is not applied in one continuous strip but rather consists of a strip of polymer dots. In any event, the 809 Patent is clear as to this definition and the Court adopts Cupid's proposal.

### L. Second Beads of Cured Polymer

Finally, the parties spar over the term "Second Beads of Cured Polymer." The difference on this point is a minor one. Jupi's construction is as follows: "one or more bands of polymer material for gripping." Cupid's is: "one or more lengths of curable polymer/cured

16

polymer/silicone that extend along a path spaced from and narrower than the curable polymer/cured polymer for finishing that finishes the edge."

As noted in its opening brief, Jupi only mildly objects to Cupid's definition because "a length is one-dimensional and therefore has no substance." (Jupi Opening Br. 34.)  Cupid argued in its opening brief that the entire context of its construction provides the substance that Jupi argues is lacking.  The Court agrees.  Jupi's "mild" objection is overruled, as Cupid's definition provides ample context to describe "length."  Cupid's definition is therefore adopted.

### III.   Conclusion

For the aforementioned reasons, the Court construes the disputed terms of the 809 Patent as detailed above.  An appropriate Order accompanies this Opinion.


Dated: September 15, 2009                    /s/ Jose L. Linares
                                             United States District Judge